1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    EASTERN DISTRICT OF CALIFORNIA

7                                    )
8   MICHAEL L. KEPHART, individually )    1:03-cv-05331  OWW TAG
    and doing business as KEPHART    )
9   BAIL BONDS,                      )    MEMORANDUM DECISION AND
                                     )    ORDER RE DEFENDANTS' MOTION
                                     )    FOR SUMMARY JUDGMENT AND IN
10              Plaintiff,           )    THE ALTERNATIVE FOR SUMMARY
                                     )    ADJUDICATION.
11        v.                         )
                                     )
12  CITY OF BAKERSFIELD, a local     )
    governmental entity; CHIEF OF    )
13  POLICE ERIC MATLOCK, an          )
    individual; DETECTIVE SCOTT E.   )
14  CARVEL, an individual; DETECTIVE )
    GREGG M. BENDER, an individual;  )
15  and DOES 1 to 100, inclusive,    )
                                     )
16                                   )
                Defendants.          )
17                                   )
    _____)
18

19

20

21            I.   INTRODUCTION

22

23      Defendants CITY OF BAKERSFIELD ("CITY"), CHIEF OF POLICE

24  ERIC MATLOCK ("MATLOCK"), DETECTIVE SCOTT E. CARVEL ("CARVEL"),

25  and DETECTIVE GREGG M. BENDER ("BENDER") move for summary

26  judgment pursuant to Federal Rule of Civil Procedure 56(c) and in

27  the alternative for summary adjudication pursuant to Federal Rule

28  of Civil Procedure 56(d).  (Doc. 39-3, Def.'s Mem.)  Plaintiff

                                1

1   MICHAEL L. KEPHART ("Plaintiff") opposes the motion.  (Doc. 42,

2   Pl.'s Opp.)

3                  II.   **PROCEDURAL HISTORY**

4

5        Plaintiff filed his original complaint on March 17, 2003.

6   (Doc. 1, Compl.)  Plaintiff's original complaint contained two

7   causes of action:  (1) violation of 42 U.S.C. § 1983 for

8   deprivation of rights under the Fourth and Fourteenth Amendments;

9   and (2) request for declaratory and injunctive relief.

10  Defendants moved to dismiss Plaintiff's original complaint on

11  October 29, 2003.  (Doc. 14, Def.'s Mot. to Dismiss)  Defendants'

12  motion to dismiss was granted with leave to amend.  (Doc. 20,

13  Order)  Plaintiff filed a First Amended Complaint on January 20,

14  2004.  (Doc. 21, First Am. Compl.)  The First Amended Complaint

15  is the operative complaint and brings three causes of action

16  against Defendants:  (1) violation 42 U.S.C. § 1983 against the

17  individual Defendants; (2) violation of 42 U.S.C. § 1983 against

18  the CITY; and (3) preliminary and permanent injunctive relief

19  against all Defendants.  Plaintiff's § 1983 causes of action are

20  based on alleged deprivation of his rights under the Fourth and

21  Fourteenth Amendments.  Plaintiff's claims include destructive

22  search, false arrest, conspiracy to violate civil rights, and

23  deprivation of his rights under the Fourteenth Amendment's equal

24  protection clause for selective enforcement.  Plaintiff also

25  alleges municipal liability based on an official capacity claim

26  against MATLOCK (for ratification and supervisory liability) and

27  against the CITY for an unconstitutional policy or practice.

28       Defendants answered the First Amended Complaint on January

                                    **2**

20, 2004.  (Doc. 23, Answer)  Defendants moved for summary judgment on April 27, 2005.  (Doc. 39, Def.'s Mem.)  Defendants submitted a statement of undisputed facts in support of their motion, which is titled "Separate Statement of Uncontroverted Facts in Support of Motion for Summary Adjudication Pursuant to FRCP 56(a)."  (Doc. 39-2, Def.'s SUF)  Plaintiff opposes Defendants' motion.  (Doc. 42, Pl.'s Opp.)  Plaintiff submitted objections to Defendants' Statement of Undisputed Facts and his own separate statement of "disputed" facts titled "Plaintiff's Separate Statement of Disputed Facts in Support of Opposition to Defendants' Motion for Summary Adjudication Pursuant to FRCP 56(a)."  (Doc. 43, Pl.'s SUF)  Defendants replied to Plaintiff's opposition.  (Doc. 48, Def.'s Reply)  Defendants did not formally object to Plaintiff's statement of undisputed facts.  Defendants state in their reply that "PLAINTIFF'S statement of disputed material facts is largely predicated on evidence that does not support the statement of disputed facts.  Specific material disputed facts as set forth by PLAINTIFF will be discussed at oral argument."  (*Id*. at 5)

Oral argument was originally scheduled for June 6, 2005, but was rescheduled and ultimately heard on June 27, 2005.[1]

---

[1] Defendants argue in their reply that Plaintiff is precluded from being heard at oral argument because Plaintiff filed his opposition three days late in violation of the Local Rules and the Federal Rules of Civil Procedure.  Plaintiff electronically filed and served his opposition fourteen days before the hearing date.  Even if Plaintiff's filing was late, Plaintiff would not be "precluded" from being heard during oral argument, as Defendant argues.  The rule states that a party will not be "entitled" to be heard at oral argument if its opposition is late, which leaves the ultimate determination to the court.

3

Jacob J. Rivas, Esq., appeared on behalf of Defendants.

David J. Frankenberger, Esq., appeared on behalf of Plaintiff.

### III.    STATEMENT OF FACTS

This action arises out of a bail bondsman's claim that the Bakersfield Police Department and Bakersfield police officers deprived him of his civil rights under the Fourth and Fourteenth Amendments through unlawful searches and seizures and under the equal protection clause of the Fourteenth Amendment through selective enforcement.

Plaintiff's complaint does not allege specific facts or events giving rise to his civil rights claims.  Likewise, Plaintiff's opposition is scattered and lacks a coherent explanation of the course of events giving rise to his claims. The facts and events were pieced together as far as was possible based on each party's submissions and on the representations of counsel during oral argument.  The starting point was Plaintiff's list of eleven separate bases for liability asserted in his opposition:  (1) an allegedly unlawful search of Plaintiff's

//

---

Local Rule 78-230(c).  Defendants argue, in conclusory fashion, that they were prejudiced by Plaintiff's "delay."  However, Defendants have made no showing they were prejudiced by receiving Plaintiff's opposition via e-mail seven days before their reply was due as opposed to ten days via e-mail before their reply was due.  Here, the interests of justice are better served by allowing all parties a full opportunity to be heard on summary judgment motion that could result in a final judgment on the merits.

apartment on March 7, 2002;[2] (2) false arrest arising from Plaintiff's March 7, 2002 arrest for burglary and fraudulent use of a credit card; (3) false arrest based on a March 21, 2002 arrest warrant for Plaintiff for possession of a bottle of steroids that was found during the March 7, 2002 search; (4) false arrest arising from Plaintiff's July 26, 2002 arrest for disorderly conduct and public drunkenness by unidentified officers; (5) BENDER and CARVEL's conspiracy to violate Plaintiff's civil rights in connection with the March 7, 2002 search of Plaintiff's apartment; (6) false arrest by unidentified officers for Plaintiff's various convictions of traffic violations; (7) false arrest for Plaintiff's arrest by unidentified officers for an alleged violation of a restraining order relating to Andrea Thomas; (8) BENDER's intentional interference with Plaintiff's efforts to apprehend a fugitive; (9) selective enforcement by Defendants targeting Plaintiff because Plaintiff is a bail bondsman; (10) municipal liability of the CITY based on (a) Chief MATLOCK's ratification of the officers' purported unconstitutional conduct in targeting and arresting Plaintiff and (b) MATLOCK's alleged failure to adequately train and instruct subordinates; and (11) municipal liability for an unconstitutional policy and/or custom or practice.

//

---

[2] Plaintiff asserts that there were four ways in which the search was unlawful: (a) BENDER obtained search warrant by lying (i.e, judicial deception); (b) the search warrant was overbroad; (c) BENDER and CARVEL conducted a destructive search; (d) BENDER and CARVEL exceeded scope of warrant.

**A.   The Parties.**

Plaintiff Michael Kephart, doing business as "Kephart Bail Bonds," is a resident of Kern County, California.  Plaintiff does business in Kern County.

Defendant MATLOCK was the Chief of Police of the Bakersfield Police Department at all times relevant to this litigation. (Doc. 39-6, Matlock Decl. ¶ 1)  MATLOCK is now retired and is no longer employed with the Bakersfield Police Department.  (*Id.* at ¶ 2)

Defendant CARVEL was employed by the Bakersfield Police Department for over thirty years before his retirement in 2005. (Doc. 39-7, Carvel Decl. ¶ 1)  At the time of his retirement, CARVEL held the rank of Detective in the Narcotics/Vice Division. (*Id.* at ¶ 2)

Defendant BENDER was employed by the Bakersfield Police Department for over thirty years before he retired in 2004. (Doc. 39-5, Bender Decl. ¶ 1)  At the time he retired, BENDER was a Detective assigned to the Narcotics Division.  (*Id.* at ¶ 2)

Defendant CITY is a municipality located in Kern County, California.

**B.   March 7, 2002: Search of Plaintiff's Residence and Plaintiff's Subsequent Arrests.**

On March 7, 2002, BENDER and CARVEL, with other members of the Bakersfield Police Department, entered Plaintiff's residence pursuant to a search warrant issued with respect to Plaintiff's roommate.  On the same day, CARVEL arrested Plaintiff for burglary and fraudulent use of a credit card.  Plaintiff claims

**6**

his civil rights were violated in a number of different ways during the course of events leading up to and following March 7, 2002.  Specifically, Plaintiff asserts the following:  (1) BENDER lied to the magistrate judge in obtaining the search warrant to search Plaintiff's residence; (2) BENDER and CARVEL conducted a destructive search, including damaging and/or destroying some of Plaintiff's personal property; (3) BENDER and CARVEL exceeded the scope of the search warrant by searching beyond Plaintiff's roommate's person and things; (4) CARVEL arrested Plaintiff for burglary and fraudulent use of a stolen credit card without probable cause and/or based on illegally-obtained evidence; (5) unidentified Bakersfield police officers arrested Plaintiff for possession of a controlled substance based on evidence seized during an unlawful search; and (6) BENDER and CARVEL conspired to violate Plaintiff's civil rights in conducting the March 7, 2000 search.

### 1.    The Search Warrant and Supporting Affidavit.

BENDER drafted and signed the probable cause affidavit upon which issuance of the search warrant for Plaintiff's residence issued.  Plaintiff's residence was located at 1921 "K" Street, Bakersfield, California.  Plaintiff lived at that address with a person named Santino Medina ("Medina").  The search warrant was issued to BENDER to search the following:

> [R]esidence at 1921 "K" Street in Bakersfield,
> California; the person of Santino Medina, 24 years of
> age, date of birth 9/30/77, 5'11", 172 lbs, brown hair,
> hazel eyes, CDL #B4953090; cocaine and derivatives of
> the same, paraphernalia associated with the preparation
> of cocaine for sale and the sale of cocaine, large
> amounts of currency, and paraphernalia associated with

**7**

cocaine.

(Doc. 43, Def.'s UF No. 3)  The search warrant also authorized search of a "vehicle described as a silver 2001 Toyota truck, having Bill Wright Toyota paper plates." (*See* Doc. 39-5, Bender Decl. Ex. B)  Neither BENDER's probable cause affidavit nor the search warrant mention Plaintiff or any authorization to conduct a search relating to Plaintiff. (*See id*. at Exs. A, B) Plaintiff refers to two affidavits, one of which was the final draft and the other which was an earlier draft. (*See* Doc. 44, Frankenberger Decl. at Ex. C, Bender Dep. 37:3-12)  The first draft included a reference to Plaintiff and the second (and final) draft omitted any reference to Plaintiff.  Plaintiff provides no citation to the earlier draft in his brief and did not indicate whether he attached it to any of his submissions.

BENDER asserts he did not make any misrepresentations or omissions of material information on the affidavit. (Doc. 43, Def.'s UF No. 5)  Plaintiff contends BENDER misled the magistrate by omitting from his probable cause affidavit that two persons lived in the apartment and that they had separate bedrooms. Plaintiff also contends BENDER misled the magistrate by omitting that one of BENDER's informants was Plaintiff's "direct business competitor." (*Id*. at Pl.'s Response to Def.'s UF No. 5)

The parties do not dispute that "[v]arious items enumerated in the warrant, including methamphetamine, were actually located within the residence during the search on 3/7/02." (Doc. 43, Def.'s UF No. 6)  It should be noted that methamphetamine was not mentioned in the search warrant; only cocaine and cocaine paraphernalia were mentioned. (*See* Doc. 39-5, Bender Decl. at

**8**

Ex. B)  However, Medina admitted in his deposition that both methamphetamine and cocaine were found in his apartment and car. (Doc. 39-8, Rivas Decl. at Ex. M, Medina Dep. 58:1-13)  Medina was not arrested on March 7, 2002, although Defendants' counsel stated during oral argument that Medina was later arrested, tried, and convicted and served time in prison for drug-related crimes.

### 2.   Plaintiff's Arrest for Burglary and Fraudulent Use of a Stolen Credit Card.

BENDER and CARVEL were both present at the March 7, 2002 search.  BENDER was a detective in the Narcotics Division at the time.  BENDER conducted the search to investigate, search, and arrest a suspected narcotics trafficker, i.e., Medina.  (*Id*. at No. 11; *see also* Doc. 39-5, Bender Decl. ¶ 15)  Plaintiff disputes BENDER's motive to conduct the search and states that BENDER also sought to investigate, search and arrest Plaintiff. (Doc. 43, Pl.'s Response to Def.'s UF No. 11; Doc. 44, Frankenberger Decl. at Ex. B, Carvel Dep. 28:5 to 29:8)

At the time of his retirement in 2005, CARVEL was a detective in the "Narcotics/Vice" Division.  (*See* Doc. 39-7, Carvel Decl. ¶ 2)  Plaintiff claims CARVEL was not in the Narcotics Division at the time of the search.  Defendants do not clarify what the "Narcotics/Vice" Division is, i.e., whether it is a single department, whether it is an overlapping department, or whether "Narcotics" and "Vice" are separate departments. Plaintiff's counsel asserted during oral argument that CARVEL was in a "different" department from BENDER.  Before his retirement,

**9**

he was assigned to "numerous details, including robbery, fraud, forgery, theft, and burglary." (*Id.*)  Since January 2002, CARVEL had been assigned to investigate fraud, forgery, and theft-related crimes.  (Doc. 43, Def.'s UF No. 17)  As to his presence at and role in the search, CARVEL states the following:

> My presence on the premises of 1921 "K" Street in Bakersfield, California was motivated out of legitimate police objectives of investigating theft and fraudulent uses of credit cards.  Although I did not actively participate in the search on 3/7/02, I was present to monitor the search and to discern if any items located on the premises were the fruits of the suspected crimes committed by KEPHART in violation of California Penal Code sections 460(a) and 484g [sic].

(Doc. 39-7, Carvel Decl. ¶¶ 20-21)

CARVEL arrested Plaintiff on March 7, 2002 for burglary and fraudulent use of a credit card.  CARVEL states in his declaration that he arrested Plaintiff after having located, in plain view, a pair of gray size 10 Nike Cortez tennis shoes. (Doc. 39-7, Carvel Decl. ¶¶ 14, 26)  CARVEL asserts that he had probable cause to believe that Plaintiff had attempted to purchase the same shoes at a Footlocker store with a stolen credit card.  (*See id.* at ¶¶ 8-14)  Specifically, a man named Brian Porter reported to CARVEL on January 29, 2002, that his credit card and wallet had been stolen from the Red Lion Inn on December 31, 2001.  Mr. Porter also reported to CARVEL that he had observed Plaintiff at the Red Lion Inn on the same date. (*Id.* ¶ 8)  CARVEL confirmed that Mr. Porter's credit card company recorded an attempted charge to Mr. Porter's credit card on January 1, 2002 that was declined at Footlocker.  (*Id.* at ¶ 10) In addition, CARVEL learned from personnel at the Red Lion Inn that a room had been registered to Colleen Kephart on December

**10**

31, 2001, the same date as the alleged theft.  (*Id*. at ¶ 13)
Neither party clarifies Plaintiff's relationship to Colleen
Kephart.

Prior to March 7, 2002, CARVEL also administered a
photographic lineup to Footlocker employees Mr./Ms. Tovar
("Tovar") and Anthony Martinez ("Martinez"), who identified
Plaintiff and stated that he was one of the individuals who
attempted to purchase a pair of gray size 10 Nike Cortez tennis
shoes.  (*Id*. at ¶¶ 12, 15)  Tovar and Martinez also stated that
after the credit card was declined, Plaintiff purchased the
tennis shoes with cash.

CARVEL asserts that Mr. Porter's reported theft of his
wallet, the identification of Plaintiff by the Footlocker
employees, and the "plain view" sighting of the gray size 10 Nike
tennis shoes in Plaintiff's residence created probable cause for
Kephart's arrest on March 7, 2002, for fraudulent use of a stolen
credit card.

### 3.    The Allegedly Destructive Search of Plaintiff's Residence.

Plaintiff asserts that the on March 7, 2002 search was
destructive.  Plaintiff asserts that Defendants damaged and/or
destroyed several items of Plaintiff's personal property,
including CDs, a Michael Jordan rookie basketball card, Texaco
collector planes, photographs, and a photo album.  (Doc. 43,
Pl.'s Response to Def.'s UF No. 7; Doc. 44, Frankenberger Decl.
at Ex. A, Kephart Dep. 54:17-21)  BENDER and CARVEL both assert
in their declarations that "the search was not destructive."

11

(Doc. 39-5, Bender Decl. ¶ 11; Doc. 39-7, Carvel Decl. ¶ 7)   The parties do not dispute that Plaintiff's roommate Medina does not recall whether the search was destructive.  (Doc. 43, Def.'s UF No. 57)

Plaintiff was not present in the apartment at the time of the search.  Plaintiff asserts he was kept outside the residence by the police officers while the search was being conducted. Plaintiff was arrested and taken to jail on the day of the search.  (*See* Doc. 44, Frankenberger Decl., Ex. A., Kephart Dep. 42:14-25)  Plaintiff testified during his deposition that he spent approximately six to eight hours in jail and that when he returned to his apartment, it was in "disarray."  (*Id*.)

### 4.   BENDER and CARVEL's purported conspiracy to violate Plaintiff's civil rights.

Plaintiff asserts that BENDER targeted Plaintiff for arrest; that BENDER and CARVEL conspired to arrest Plaintiff; and that BENDER and CARVEL conspired to use the March 7, 2002 search as a pretext for violating Plaintiff's constitutional rights. (Doc. 43, Pl.'s Response to Def.'s UF Nos. 14-16)  Plaintiff cites to the following deposition testimony of CARVEL in support of his allegations of conspiracy:

> Q.   Did you have any involvement in the investigation of Mr. Kephart's roommate, Santino Medina, in terms of a possible narcotics offense?
>
> A.   I was contacted by Detective Bender of our narcotics unit and advised that a search warrant was going to be conducted at Mr. Kephart's residence.  I know now, but I don't know when I found this out, and it wasn't before I went there, that the actual search warrant was for Mr. Kephart's roommate.  I don't believe I was ever

1      told that prior to going there.

2          I was asked to accompany Detective Bender to the
           -- on the search warrant for two reasons.  One,
3          Detective Bender was aware that I was
           investigating Mr. Kephart as a possible suspect in
4          a theft, and I also have expertise in the vice
           investigations of the Deja Vu nightclub, and there
5          was, I guess, some information that Mr. Kephart or
           his roommate or his girlfriend were tied to the
6          possible use of narcotics at the Deja Vu.

7          I went with Detective Bender on the search warrant
           as an observer and consultant to anything that
8          needed to be asked about the Deja Vu or that might
           tie into an investigation that I would open at the
9          Deja Vu.

10     (Doc. 39-8, J. Rivas Decl., Ex. A Carvel Dep. 28:21-25; 29:1-15)

11         Plaintiff cites the following deposition testimony of BENDER

12     in support of his allegations of conspiracy:

13     Q.   Detective Carvel testified this morning, in
            essence, that you contacted him prior to service
14          of the search warrant, Exhibit 4, and to
            essentially invite him to observe the execution of
15          that search warrant.

16          Do you recall things differently?

17     A.   I did have contact with him and tell him he was --
            that I was serving the search warrant.  I am aware
18          of that.  I don't know if I invited him or he
            asked to come along.  I don't know which way that
19          went.

20     Q.   Why did you contact Detective Carvel at that time?

21     A.   Because at some point prior to the execution of
            the search warrant, I learned or Detective Carvel
22          learned  -- I don't know who determined what --
            but that there was an active investigation.
23          Carvel had an active theft investigation on both
            individuals.

24
25     Q.   And that would be Kephart and Medina?

       A.   Yes.
26
27     Q.   Do you recall if it was Detective Carvel who
            informed you that he had an active investigation
            regarding Kephart rather than you learning that
28          from some source other than Detective Carvel?

**13**

```
A.    I don't -- I'm trying to think here.  I'm not real
      sure how that came about, how Carvel -- how I knew
      Carvel was the one.  I'm not sure.
```

(Doc. 44, Frankenberger Decl. at Ex. C, Bender Dep. 39:13 to 40:12)

Defendants cite the following statement from CARVEL's declaration in support of their contention that there was no agreement or conspiracy between CARVEL and BENDER to violate Plaintiff's constitutional rights:

> I did not enter into an agreement with any other individuals, including BENDER, to violate KEPHART's constitutional rights in performing any of the acts that I did as they relate to my interactions with KEPHART.  At no time was there ever any discussion between myself and any third person to use the search warrant of 3/7/02 as a pretext for violating KEPHART's constitutional rights.

(Doc. 39-7, Carvel Decl. ¶¶ 23-4)

Defendants cite to the following statement from BENDER's declaration in support of their contention that there was no agreement with any other individuals, including CARVEL, to violate Plaintiff's constitutional rights:

> My decision to investigate, search, and seize property located on the premises at 1921 "K" Street was unrelated to KEPHART residing on the premises.  I did not enter into an agreement with any other individuals, including CARVEL, to violate KEPHART's constitutional rights in performing any of the acts that I did as they relate to my interactions with KEPHART.  At no time was there ever any discussion between myself and any third person to use the search warrant on 3/7/02 as a pretext for violating KEPHART's constitutional rights.

(Doc. 39-5, Bender Decl. ¶¶ 18-20)

//

//

**5.   The March 21, 2002 Arrest Warrant for Plaintiff for Possession of a Controlled Substance.**

During the search of Plaintiff's residence, steroids were located in Plaintiff's bedroom.  (Doc. 43, Def.'s UF No. 44) Plaintiff testified he has never taken or sold steroids:

> Q.   Do you know if any steroids were found on the premises [i.e., in your apartment]?
>
> A.   That's what they alleged were found in my bedroom.
>
> Q.   Were you, in fact, in possession of any steroids on that day?
>
> A.   I've never taken steroids.
>
> Q.   Ever sold them?
>
> A.   Never sold steroids.  I was not aware of the steroids being in my possession until seven days after that arrest of the burglary.
>
> Q.   How was it that you became aware of the steroids?
>
> A.   Internal Affairs contacted me after I went and complained about getting some of my property back that was....

(Doc. 44, Frankenberger Decl. at Ex. A, Kephart Dep. 47:13-25) BENDER testified in his deposition that the steroids were found in Plaintiff's bedroom behind a brick that was removed from a wall.  (Doc. 39-8, Rivas Decl. at Ex. B, Bender Dep. 46:21-25 to 47:1)  Defendants assert that a March 21, 2002 arrest warrant for Plaintiff issued for alleged possession of this bottle of steroids.  (*See* Doc. 39-3, Def.'s Mem. 3)  Plaintiff's counsel indicated during oral argument that the case against Plaintiff was dismissed for failure of the state prosecutor to produce discovery.  CARVEL and BENDER assert they were not involved in Plaintiff's arrest for possession of a controlled substance. (Doc. 39-5, Bender Decl. ¶ 12; Doc. 39-7, Carvel Decl. ¶ 17)

**C.   Plaintiff's July 26, 2002 Arrest for Disorderly Conduct and Public Drunkenness.**

Defendants assert that Plaintiff was arrested for disorderly conduct and public drunkenness and was taken to the detoxification center at the Kern County Jail.  (Doc. 39-3, Def.'s Mem. 3)  Defendants assert that no charges were filed and Plaintiff was not required to appear in court.  Neither Defendants nor Plaintiff provide any evidence regarding the circumstances surrounding this incident.  However, Defendants' counsel stated during oral argument that Officers McBride, Alred, and Youngblood were the arresting officers and that none of these individuals were deposed during discovery.

**D.   Plaintiff's Alleged Traffic and Parking Violations.**

Defendants also assert that Plaintiff was charged with the following traffic citations:

   (1)   January 6, 2002 -- unsafe lane change, no proof of insurance, broken tail lamp;

   (2)   February 22, 2002 -- broken tail lamp and no proof of insurance;

   (3)   April 10, 2002 -- use of scooter on highway with no lighting equipment and/or helmet; and

   (4)   June 12, 2002 -- speeding.

(Doc. 39-3, Def.'s Mem. 3)

Defendants assert that Plaintiff was found guilty of the following traffic violations:

   (1) January 6, 2002 -- unsafe lane change and no proof of insurance (Cal. Vehicle Code §§ 21658A, 60285A); and

**16**

(2) June 12, 2002 -- speeding (Cal. Vehicle Code § 22350).

It is undisputed that neither BENDER nor CARVEL ever investigated, detained, cited, or arrested Plaintiff in connection with any of these traffic or parking citations.  (Doc. 43, Def.'s UF Nos. 46, 47)  Neither Defendants nor Plaintiff provide any evidence regarding the specific circumstances surrounding the traffic and/or parking incidents.  Plaintiff does not dispute Defendants' contentions.

**E.    Plaintiff's Alleged Violation of a Temporary Restraining Order.**

Defendants assert that Plaintiff "has had contact with the Bakersfield Police Department arising out of incidents with Andrea Thomas, who has complained to the Bakersfield Police Department about harassment by KEPHART in violation of an operative temporary restraining order."  (Doc. 39-3, Def.'s Mem. 3)  Plaintiff construes this "contact" as his "[c]laim of false arrest for violation of restraining order and/or domestic violence."  (Doc. 42, Pl.'s Opp. 16)  Neither party clarifies whether Plaintiff was ever actually arrested for violation of the restraining order.  There is no dispute that neither BENDER nor CARVEL was involved in this arrest/incident concerning Plaintiff and Andrea Thomas.

**F.    BENDER's Alleged Interference with Plaintiff's Apprehension of a Fugitive.**

Plaintiff asserts in his opposition that "BENDER, based upon

17

his personal distain [sic] for PLAINTIFF, intentionally interfered with PLAINTIFF's efforts to apprehend international fugitive Adam Scott Gallegos, causing PLAINTIFF to be liable for the $30,000.00 bond issued in connection with the initial arrest of Mr. Gallegos." (Doc. 42, Pl.'s Opp. 16)  Defendants dispute that a police officer's "assist[ance] in the extradition of an international fugitive" can form the basis of a constitutional violation." (Doc. 48, Def.'s Reply 5)  In support of his argument, Plaintiff cites to approximately ten pages of BENDER's deposition testimony without a summary of the course of events. (Doc. 43, Pl.'s DF Nos 67, 68; Doc. 44, Frankenberger Decl. at Ex. C, Bender Dep. 14:5 to 25:8)

During oral argument, Plaintiff's counsel explained that the § 1983 claim is based in part on BENDER's refusal to arrest a fugitive who fled to Costa Rica and for whom Plaintiff had posted $30,000.00 bond.  Plaintiff's counsel asserted that BENDER's refusal to have Mr. Gallegos arrested was because BENDER knew that Plaintiff posted bond for Mr. Gallegos and would forfeit that money if Mr. Gallegos never returned.  Plaintiff's theory presupposes that BENDER had a duty to arrest the alleged fugitive on Plaintiff's report.  Plaintiff does not claim he made a citizens' arrest of the fugitive.

### G. **Defendants' Alleged Animus Toward Plaintiff.**

Plaintiff claims that BENDER has admitted he harbors animus towards Plaintiff and that BENDER took offense to some of Plaintiff's business methods, including Plaintiff's distribution of T-shirts reading "CRIME PAYS." (*Id.*)  To support his

**18**

1  contention that BENDER harbors animus towards Plaintiff,

2  Plaintiff cites to BENDER's deposition testimony that "I have

3  known bail bondsmen all my life, and every one of them has been a

4  decent guy, but I'll be honest with you.  I wouldn't go so far

5  with Mr. Kephart."  (Doc. 44, Frankenberger Decl., Ex. C Bender

6  Dep. 60:12-15)  To support his contention that Defendants,

7  including BENDER, took offense at Plaintiff's "Crime Pays" T-

8  shirts, Plaintiff cites to the following deposition testimony of

9  his roommate, Medina:

10      A.    It was a white "crime pays" shirt.

11      Q.    Do you recall the officers asking you about that
              T-shirt?

12
        A.    I think they laughed about it, now that you
13            mention it.  That's about it, though.

14  (Doc. 44, Frankenberger Decl. at Ex. I, Medina Dep. 65:22-25 to

15  66:1)

16

17      **H.    <u>Allegations of Municipal Liability.</u>**

18      Plaintiff asserts that MATLOCK participated in all of

19  Plaintiff's arrests by ratifying his subordinates' actions and/or

20  by failing to adequately train his subordinates.  (*Id.* at Pl.'s

21  Response to Def.'s UF No. 39)  In support, Plaintiff cites to the

22  following deposition testimony of John Thomas Pryor, whom

23  Plaintiff does not identify:

24      Q.    And you would have had to -- in essence, you or
              Roark would have had to ratify that deal before it
25            was offered to Mr. Medina?

26      A.    Or the conversation could have occurred and then
              Detective Bender would come brief either Sergeant
27            Roark or myself on that and we would either
              approve it or reject it.

28

**19**

1                              ***

2    Q.   Would it be fair to say, try to kind of sum this
          up a little bit, let's use Detective Bender as a
3         hypothetical here.  Detective Bender comes to you
          with a report on a case and you can either agree
4         with his approach or disagree with is approach?

5    A.   Yes.

6    Q.   So if you're agreeing with his approach, you're
          essentially ratifying his activity?
7
     A.   Correct.
8
                               ***
9
     Q.   Now, at the time of this incident, March 7, 2002,
10        who was your direct supervisor?

11   A.   Lieutenant Melvin Scott.

12   Q.   And Lieutenant Scott would report to a captain,
          correct?
13
     A.   Yes.
14
     Q.   Do you know who that captain was at the time?
15
     A.   It could have been either Dave Jackson or Neal
16        Mahan.  There was a retirement around that time
          frame and I'm not sure exactly where that occurred
17        in relationship to this investigation.

18   Q.   And at the time of this incidence, again March 7,
          2002, Eric Matlock was the chief of police, correct?
19
     A.   Yes.
20
     Q.   Did Chief Matlock have an assistant chief at that
21        time?

22   A.   I believe it would have been Bill Rector.

23
     (Doc. 44, Frankenberger Decl. at Ex. G, Pryor Dep. 23:24 to 24:5;
24
     30:17-25; 32:12 to 33:3)  Plaintiff provides no explanation as to
25
     the respective roles that the individuals referred to in the
26
     above testimony played in this case.  Plaintiff asserted during
27
     oral argument that this testimony and other uncited testimony
28

                                  20

establishes that MATLOCK deferred to the police captains who, in

turn, deferred to their subordinates.

Plaintiff also cites to the following testimony of MATLOCK:

Q.   Be fair to say that the captain has a role that is
     almost all publc relations, administrative and
     supervisory as opposed to anything really hands-
     on?

A.   Yes.  The lieutenants report directly to the
     captain, so that's where he would become directly
     engaged in supervision.

Q.   So if the lieutenant was to have a question about
     an investigation or a question brought to the
     lieutenant by a detective, the lieutenants could
     go to his captain, kind of get the final say
     within the division at least as to how to proceed
     in a certain instance?

A.   Generally speaking, I'd say that's the case.

(*Id.* at Ex. E Matlock Dep. 12:1-13)

No allegation is made that the chief is involved in the case

review or approval process.


## IV.   LEGAL STANDARDS


### A.   Summary Judgment Pursuant to Fed. R. Civ. P. 56.

Summary judgment is warranted only "if the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact."  Fed. R. Civ. P. 56(c);

*California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998)

Therefore, to defeat a motion for summary judgment, the non-

moving party must show (1) that a genuine factual issue exists

and (2) that this factual issue is material.  *Id.*  First, an

issue is "genuine" when the non-moving party produces evidence on

which a reasonable trier of fact could find in its favor when viewing the record as a whole and in light of the evidentiary burden the law places on the non-moving party. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986). Second, facts are "material" if they "might affect the outcome of the suit under the governing law." *Campbell*, 138 F.3d at 782 (quoting *Liberty Lobby*, 477 U.S. at 248)  Whether a factual issue is material is determined by the substantive law. *Liberty Lobby,* 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  However, if the non-moving party has the burden of proof at trial, then the moving party's initial burden is only to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor when viewing the record as a whole and in light of the evidentiary burden the law places on the non-moving party. *Triton Energy Corp.*, 68 F.3d at 1221.  The non-moving party cannot simply rest on its allegations without any significant probative evidence tending to support the

1  complaint.  *Devereaux*, 263 F.3d at 1076.

> 2 [T]he plain language of Rule 56(c) mandates the entry
> 3 of summary judgment, after adequate time for
>   discovery and upon motion, against a party who fails
>   to make a showing sufficient to establish the
> 4 existence of an element essential to the party's
>   case, and on which that party will bear the burden of
> 5 proof at trial.  In such a situation, there can be
>   "no genuine issue as to any material fact," since a
> 6 complete failure of proof concerning an essential
>   element of the nonmoving party's case necessarily
> 7 renders all other facts immaterial.

8  *Celotex Corp.*, 477 U.S. at 322-23.

9       "In order to show that a genuine issue of material fact

10 exists, the nonmoving party must introduce some 'significant

11 probative evidence tending to support the complaint.'"  *Rivera v.*

12 *AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003) (quoting *Liberty*

13 *Lobby*, 477 U.S. at 249).  If the moving party can meet his burden

14 of production, the non-moving party "must produce evidence in

15 response....  [H]e cannot defeat summary judgment with

16 allegations in the complaint, or with unsupported conjecture or

17 conclusory statements."  *Hernandez v. Spacelabs Med., Inc.*, 343

18 F.3d 1107, 1112 (9th Cir. 2003). "Conclusory allegations

19 unsupported by factual data cannot defeat summary judgment."

20 *Rivera*, 331 F.3d at 1078 (citing *Arpin v. Santa Clara Valley*

21 *Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)).

22      The more implausible the claim or defense asserted by the

23 non-moving party, the more persuasive its evidence must be to

24 avoid summary judgment.  *See United States ex rel. Anderson v. N.*

25 *Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless,

26 "[t]he evidence of the non-movant is to be believed, and all

27 justifiable inferences are to be drawn in its favor."  *Liberty*

28 *Lobby*, 477 U.S. at 255.  A court's role on summary judgment is

not to weigh evidence or resolve issues; rather, it is to find

genuine factual issues:

> [A]t the summary judgment stage the judge's function is
> not himself to weigh the evidence and determine the
> truth of the matter but to determine whether there is a
> genuine issue for trail. ... [T]here is no issue for
> trial unless there is sufficient evidence favoring the
> nonmoving party for a jury to return a verdict for that
> party.

*Liberty Lobby*, 477 U.S. at 249 (internal citations omitted); *see*

*also Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir.

1996).


**B.   Summary Adjudication Pursuant to Fed. R. Civ. P. 56(d).**

The purpose of Rule 56(d) is to salvage some results from

the judicial effort involved in evaluating a summary judgment

motion and to frame narrow triable issues if the court finds that

the order would be helpful with the progress of litigation.

*National Union Fire Ins. Co. v. L.E. Myers Co., Inc.*, 937

F. Supp. 276, 285 (S.D.N.Y. 1996).  An order under Rule 56(d)

narrows the issues and enables the parties to recognize more full

their rights, yet it permits the court to retain full power to

completely adjudicate all aspects of the case when the proper

time arrives.  *See* 10B Wright & A. Miller, Federal practice and Procedure

§ 2737 (3d ed. 1998).

The procedure under Rule 56(d) is designed to be ancillary

to a summary judgment motion.  Unlike Rule 56(c), which allows

for interlocutory judgment on a question of liability, Rule 56(d)

does not authorize the entry of a judgment on part of a claim or

the granting of partial relief.  *Id.* at § 2737.

The obligation imposed on the court by Rule 56(d) to specify

24

the uncontroverted material facts is technically compulsory.  *See*

*Woods v. Mertes*, 9 F.R.D. 318, 320 (D. Del. 1949).  However, if

the court determines that identifying indisputable facts through

partial summary judgment would not materially expedite the

adjudicative process, it may decline to do so.  *See* WRIGHT & MILLER

at § 2737.

   **B.   42 U.S.C. § 1983.**

     "Section 1983 provides for liability against any person

acting under color of law who deprives another 'of any rights,

privileges, or immunities secured by the Constitution and laws'

of the United States."[3]  *S. Cal. Gas Co. v. City of Santa Ana*,

336 F.3d 885, 887 (9th Cir. 2003) (quoting 42 U.S.C. § 1983).

//

//

---

   [3] Specifically, 42 U.S.C. § 1983 provides:

     Every person who, under color of any statute,
     ordinance, regulation, custom, or usage, of any State
     or Territory or the District of Columbia, subjects, or
     causes to be subjected, any citizen of the United
     States or other person within the jurisdiction thereof
     to the deprivation of any rights, privileges, or
     immunities secured by the Constitution and laws, shall
     be liable to the party injured in an action at law,
     suit in equity, or other proper proceeding for redress,
     except that in any action brought against a judicial
     officer for an act or omission taken in such officer's
     judicial capacity, injunctive relief shall not be
     granted unless a declaratory decree was violated or
     declaratory relief was unavailable. For the purposes of
     this section, any Act of Congress applicable
     exclusively to the District of Columbia shall be
     considered to be a statute of the District of Columbia.

### 1.  Suits Against Local Governments: The *Monell* Doctrine.

Local governments are "persons" subject to suit for "constitutional tort[s]" under 42 U.S.C. § 1983.[4]  *Haugen v. Brosseau*, 339 F.3d 857, 874 (9th Cir. 2003) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n. 55 (1978)).  "[T]he legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies."  *Monell*, 436 U.S. at 690.  Local governments can be sued for monetary, declaratory, or injunctive relief where such suits arise out of unconstitutional actions that implement or execute a "policy statement, ordinance, or decision officially adopted and promulgated by that body's officers...."  *Id*. at 690-1.  If no official policy exists, "customs and usages" may fulfill this element of a § 1983 claim against a local government.  *Id*.

A local government's liability is limited, however.  Although a local government can be held liable for its official policies or customs, it will not be held liable for an employee's actions outside of the scope of these policies or customs.  "A

_____

[4] "There is certainly no constitutional impediment to municipal liability. 'The Tenth Amendment's reservation of nondelegated powers to the States is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment.'" *Monell*, 436 U.S. 691 (quoting *Milliken v. Bradley*, 433 U.S. 267, 291 (1977)).  There is no "basis for concluding that the Eleventh Amendment is a bar to municipal liability." *Id*. (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976); *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890)).

municipality cannot be held liable solely because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.  "A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id*. at 694.

To prevail on a § 1983 complaint against a local government under *Monell*, a plaintiff must satisfy a three-part test:

(1)  The local government official(s) must have intentionally violated the plaintiff's constitutional rights;

(2)  The violation must be a part of policy or custom and may not be an isolated incident; and

(3)  A nexus must link the specific policy or custom to the plaintiff's injury.

*See Monell*, 436 U.S. at 690-92.

## 2.  Suits Against Governmental Officials

### (a)  Official-Capacity Suits

"[Section] 1983 claims against government officials in their official capacities are really suits against the governmental employer because the employer must pay any damages awarded." *Butler v. Elle*, 281 F.3d 1014, 1023 (9th Cir. 2002) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)); *see also Doe v.*

1  *Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997)
2  (finding that "a suit against a state official in his official
3  capacity is no different from a suit against the [official's
4  office or the] State itself") (citing *Will v. Mich. Dep't of*
5  *State Police*, 491 U.S. 58, 70-71 (1989).  "As the Supreme Court
6  has stated, 'official-capacity suits...generally represent only
7  another way of pleading an action against an entity of which an
8  officer is an agent.'"  *Ruvalcaba v. City of Los Angeles*,
9  167 F.3d 514, 524 n.3 (9th Cir. 1999) (quoting *Graham*, 473 U.S.
10  at 165).  "'As long as the government entity receives notice and
11  an opportunity to respond, an official-capacity suit is, in all
12  respects other than name, to be treated as a suit against the
13  entity.'"  *Ruvalcaba*, 167 F.3d at 524 n.3 (quoting *Graham*,
14  473 U.S. at 166.).

16  **(b)  Personal-Capacity Suits**

17       "'Personal-capacity suits seek to impose personal liability
18  upon a government official for actions he takes under color of
19  state law.'"  *Dittman v. Cal.*, 191 F.3d 1020, 1027 (9th Cir.
20  1999) (quoting *Graham*, 473 U.S. at 165); *see also Hafer v. Melo*,
21  502 U.S. 21, 25 (1991) (finding that "[p]ersonal capacity suits
22  seek to impose liability on state officials for acts taken under
23  color of state law"); *Stivers v. Pierce*, 71 F.3d 732, 749 (9th
24  Cir. 1995).  In setting forth the distinctions between personal
25  and official capacity suits, the Supreme Court said:

26       Personal-capacity suits seek to impose personal
         liability upon a government official for actions he
27       takes under color of state law.  *See, e.g., Scheuer
         v. Rhodes*, 416 U.S. 232, 237-238 (1974).
28       Official-capacity suits, in contrast, "generally

**28**

represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*[], 436 U.S. at 690, n. 55 []. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon*, 469 U.S., at 471-472. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Graham*, 473 U.S. 159, 166 (1985).

"While the plaintiff in a personal-capacity suit need not establish a connection to governmental 'policy or custom,' officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law."[5] *Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir. 1992) (quoting *Graham*, 473 U.S. at 166-167). Individuals are not immune under the

---

[5] Immunity is not absolute, as the Ninth Circuit has explained:

This court has held that, when a public official acts in reliance on a duly enacted statute or ordinance, that official ordinarily is entitled to qualified immunity. *See Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994) (holding that "an officer who reasonably relies on the legislature's determination that a statute is constitutional should be shielded from personal liability"). The existence of an authorizing statute is not dispositive, however. Qualified immunity does not extend to a public official who enforces a statute that is "patently violative of fundamental constitutional principles." *Id.* at 1209.

*Dittman*, 191 F.3d at 1027.

29

doctrine of qualified immunity if they violated "clearly

established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982).  "A victory in such a suit is a

'victory against the individual defendant, rather than against

the entity that employs him.'" *Cerrato v. San Francisco

Community College Dist.*, 26 F.3d 968, 973 (9th Cir. 1994)

(quoting *Graham*, 473 U.S. at 166-67).

### C.   <u>Summary Judgment in a Qualified Immunity Case.</u>

Defendants BENDER and CARVEL assert the defense of qualified

immunity.  A court must apply a two-step analysis in determining

whether a defendant is entitled to the protection of qualified

immunity.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, a

court must ask whether a constitutional violation occurred at

all.  *Id.*  If the answer to this question is yes, the court must

then determine whether the right violated was "clearly

established" by asking whether a reasonable officer could believe

that the defendant's actions were lawful.  *Id.*

It is clear that the traditional summary judgment approach

should be used in analyzing the first step of the *Saucier*

analysis:

> A court required to rule upon the qualified immunity
> issue must consider, then, this threshold question:
> Taken in the light most favorable to the party
> asserting the injury, do the facts alleged show the
> officer's conduct violated a constitutional right?
> Where the facts are disputed, their resolution and
> determinations of credibility are manifestly the
> province of a jury.

*Wall v. County of Orange*, 364 F.3d 1107, 1110-1 (2004) (internal

citations and quotations omitted).

In the second step of the *Saucier* analysis, the court must ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted.  Although this inquiry is primarily a legal one, where the reasonableness of the officer's belief "depends on the resolution of disputed issues of fact...summary judgment is not appropriate." *Wilkins v. City of Oakland*, 364 F.3d 949, 1110-11 (9th. Cir. 2003) (internal citations and quotations omitted).

## VI.   ANALYSIS

### A.   Whether Defendants BENDER and CARVEL are entitled to Qualified Immunity as to the Unlawful Search and Seizure Claims.

Plaintiff's § 1983 claim for violation of his Fourth Amendment right to be free from unlawful searches and seizures is based upon four separate asserted violations:  (1) BENDER obtained the search warrant by misleading the magistrate; (2) the search warrant was overbroad in that it did not adequately describe the premises to be searched and/or the items to be seized; (3) BENDER and CARVEL conducted an unconstitutionally destructive search of Plaintiff's residence in violation of the Fourth Amendment; and (4) BENDER and CARVEL's search of Plaintiff's residence exceeded the scope of the search warrant.

Defendants argue qualified immunity as to only two of these claims.  First, Defendants argue that BENDER is entitled to qualified immunity as to the judicial deception claim because there is no evidence that BENDER misled the magistrate.  (*See*

1  Doc. 39-3, Def.'s Mem. 7-9)  Plaintiff responds that BENDER did

2  mislead the magistrate by omitting stating in his affidavit that

3  two individuals lived at the apartment in separate bedrooms and

4  that one of the confidential informants was another bail bondsman

5  and Plaintiff's competitor.  Second, Defendants argue that CARVEL

6  is entitled to qualified immunity because he conducted his search

7  in reliance on his fellow officer's representation that the

8  search warrant was valid.  (*Id*.)  Plaintiff responds that neither

9  BENDER nor CARVEL is entitled to qualified immunity because they

10 exceeded the scope of the warrant in conducting their search.

11 Although Defendants do not formulate their arguments regarding

12 Plaintiff's two other claims in terms of qualified immunity,

13 Defendants' arguments will nevertheless be construed as such.

14 *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (qualified

15 immunity should be determined at the "earliest possible stage in

16 litigation"); accord *Saucier*, 533 U.S. at 200.

17      Qualified immunity is an entitlement not to stand trial;

18 that is, it is an immunity from suit rather than a defense on the

19 merits.  *Rudebusch v. Hughes*, 313 F.3d 506, 514 (9th Cir. 2002).

20 As a result, the doctrine of qualified immunity safeguards all

21 but the plainly incompetent or those who knowingly violate the

22 law.  *Id*.; *Hunter*, 502 U.S. at 228; *Saucier*, 533 U.S. at 200-1.

23 Qualified immunity grows out of the policy concern that few

24 individuals would enter public service if they risked personal

25 liability for their official decisions.  *Malley v. Briggs*, 475

26 U.S. 335, 339 (1986).  The immunity "spare[s] a defendant not

27 only unwarranted liability, but unwarranted demands customarily

28 imposed upon those defending a long drawn out lawsuit."  *Siegert*

*v. Gilley*, 500 U.S. 226, 232 (1991).

In a summary judgment motion, to overcome the qualified immunity defense, a plaintiff must establish (1) a constitutional right was violated and (2) the right was "clearly-established." *Saucier*, 533 U.S. at 201; *see also Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002).

### 1. Plaintiff's assertion that BENDER misled the magistrate.

Plaintiff's § 1983 claim is based in part on his assertion that BENDER misled the magistrate in obtaining the search warrant. There is a "presumption of validity with respect to [a] search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1975). An officer loses the "shield of qualified immunity" if he "submitted an affidavit that contained statements he knew to be false or would have known to be false had he not recklessly disregarded the truth." *Butler*, 281 F.3d 1024 (quoting *Hervey v. Estes*, 65 F.3d 784, 788-9) (9th Cir. 1995)).

On a summary judgment motion in a judicial deception case, the standard is as follows:

> The plaintiff alleging judicial deception must make a substantial showing of deliberate falsehood or reckless disregard for the truth and establish that but for the dishonesty, the challenged action would not have occurred. If the matter survives the summary judgment phase, the matter should go to trial.

*Id*. (quoting *Hervey*, 65 F.3d at 788-9)).

In the Ninth Circuit, the case law "effectively intertwine[s]" the constitutional violation question with the question of deliberate falsehood or reckless disregard for the

1  truth:

2
> This merger is ultimately appropriate because...no
3
> reasonable officer could believe that it is
> constitutional to act dishonestly or recklessly with
> regard to the basis for probable cause in seeking a
4
> warrant. ...   If [the officer] was reckless or
> deceitful in preparing the warrant affidavit, then he
5
> both violated [the plaintiff's] rights and is not
> entitled to qualified immunity.

6

7  *Id.*

8    In sum, search warrants are presumed valid and Defendants'

9  initial burden is only to show that there is an absence of

10  evidence that BENDER misled the magistrate.  *Celotex*, 477 U.S. at

11  325.  To overcome a qualified immunity defense on a summary

12  judgment motion in a judicial deception case, a plaintiff must

13  make (1) a substantial showing of deliberate falsehood or

14  reckless disregard for the truth, and (2) establish that but for

15  the dishonesty, the magistrate would not have issued the warrant.

16  *Id.*; *see also Lombardi v. City of El Cajon*, 117 F.3d 1117 (9th

17  Cir. 1997).

18    Here, BENDER drafted and signed a probable cause affidavit

19  to obtain the search warrant for the search conducted of

20  Plaintiff's residence on March 7, 2002.  Defendants assert that

21  there is no evidence that BENDER misled the magistrate.

22  Plaintiff argues that BENDER mislead the magistrate by (1)

23  omitting to disclose that two individuals resided in the

24  apartment, in two separate bedrooms; and (2) that one of BENDER's

25  confidential informants was Plaintiff's "direct business

26  competitor."  (Doc. 43, Pl.'s Response to UF No. 5)

27    First, Plaintiff has made no showing that BENDER's omission

28  to disclose that two individuals lived in the apartment was the

1  result of a deliberate or reckless disregard for the truth or

2  what difference it could have made.  Plaintiff has made no

3  showing that the magistrate judge would not have issued the

4  search warrant if that information had been included.  Plaintiff

5  does not dispute that probable cause existed to search his

6  roommate Medina for drugs and drug paraphernalia, and Plaintiff

7  does not argue that BENDER's affidavit contained any falsehoods

8  or omissions regarding the information about Medina.  (Doc. 43,

9  Def.'s UF Nos. 3-5)

10      BENDER's omission from his affidavit that two persons lived

11  at the apartment (if BENDER knew that to be the fact), in no way

12  affects the existence of probable cause to search the residence

13  for drugs, drug paraphernalia, and large amounts of currency with

14  respect to Medina, which Plaintiff also does not dispute were

15  actually present in the apartment.  (*See* Doc. 43, Def.'s UF No.

16  3)

17      Second, Plaintiff has made no showing that BENDER's omission

18  to disclose that one of BENDER's confidential informants was

19  Plaintiff's "direct business competitor" was a deliberate

20  falsehood or was made in reckless disregard for the truth.  As a

21  preliminary matter, Plaintiff cites to deposition testimony of an

22  individual named Joseph Aldana as support, but provides no

23  foundation explaining who Joseph Aldana is or what role he played

24  in the Medina and/or Kephart investigations and arrests.  Even if

25  this testimony is considered, it does not establish that the

26  confidential informant was Plaintiff's "direct business

27  competitor" -- Mr. Aldana, whoever he is, only identifies the

28  informant as another bail bondsman who was working in

**35**

1    Bakersfield.[6]   (Doc. 44, Frankenberger Decl. at Ex. D, Aldana

2    Dep. 14:9-12)   In short, Plaintiff has provided no evidence that

3    the interests of the confidential informant, who was also in the

4    —————————————

5          [6] Mr. Aldana's testimony is as follows:

6          Q.   Are you familiar with Mr. Kephart?
           A.   Yes.
7          Q.   How are you familiar with him?
           A.   Well, before Detective Bender started this
8               investigation, I had received information on Mr.
                Kephart.
9          Q.   What type of information did you receive?
           A.   That he was involved in the sale of narcotics.
10         Q.   And you're talking about a time period before
                March of 2002 --
11         A.   Yes.
12         Q.   -- when you first heard that?
           A.   Yes.
13         Q.   Do you recall approximately when that was that you
                first heard that about Mr. Kephart?
14         A.   I would say within a two-year time period before
15              the execution of the search warrant.
           Q.   Do you know how you first acquired that
16              information?
           A.   Yes, I do.
17         Q.   How did you acquire it?
                              ***
18         A.   I won't give the name, it was just another bail
19              bondsman who, on occasion, we'd utilized as an
                informant.
20         Q.   That would be a bail bondsman who, at least at one
21              point in time, was working as such in the City of
                Bakersfield?
22         A.   Yes.
           Q.   Without giving up that person's name, do you
23              recall generally what that person told you about
                Mr. Kephart?  Was it anything more than he might
24              be selling narcotics, for example?
25         A.   I just remember that this other bail bondsman had
                said Mr. Kephart was selling narcotics, and I
26              can't remember what kind or what type or where
                from.
27
     (Doc. 44, Frankenberger Decl. at Ex. D, Aldana Dep. 13:5 to
28   14:19)

bail bond business, were so contrary to Plaintiff's so as to create doubt regarding the reliability of the information.  That someone is a business competitor of a person who is not the direct focus of a search warrant application, is not *per se* information that must be disclosed to a magistrate.  That informant was independently reliable and provided accurate information to furnish probable cause as to Medina and the residence.

For example, in *Lombardi*, the Ninth Circuit held that the plaintiff made a substantial showing that the confidential informants had reasons for disliking the plaintiff where the informants were the plaintiff's former girlfriend and her son. 117 F.3d at 1126.  The court held that omitting the information about the relationship the informants had with the plaintiff was misleading and that the plaintiff had met his burden as to the first prong, i.e., to establish the officer's deliberate falsehood or reckless disregard for the truth.  *Id*.

Here, however, omitting that one of the informants was another bail bondsman in Bakersfield, without more, is not misleading.  BENDER stated in his affidavit that his basis for relying on information provided by the two informants (referred to as "CRI #1" and CRI #2") is that "[d]uring the last six months, the informants have furnished me with information which, through investigation, has led to the arrest of at least two persons, each, for narcotic and dangerous drug violations and the seizure of narcotics."  (Doc. 39-5, Bender Decl. at Ex. A "Probable Cause Affidavit" at Page 3)  Omitting that one of the informants was another bail bondsman who may have been familiar

with Kephart is not misleading.  Informants must have some familiarity with the person about whom they provide information. The search warrant in dispute was issued as to Medina, not as to Plaintiff.  Plaintiff cannot litigate the rights or interests of his roommate; he can only litigate his own interests.  *Coalition of Clergy, Lawyers, and Professors v. Bush*, 310 F. 3d 1153, 1163 (9th Cir. 2002) (citing *Singleton v. Wulff*, 428 U.S. 106, 113-4 (1976); *Warth v. Seldin*, 422 U.S. 490, 498-9 (1975)).

To the extent Plaintiff bases his § 1983 claim on an allegation of judicial deception, Defendants' Motion for Summary Adjudication is **GRANTED.**  BENDER is immune from suit as to Plaintiff's § 1983 claim for unlawful search and seizure insofar as it is based on a theory of judicial deception.

### 2.    Plaintiff's assertion that CARVEL and BENDER conducted a search outside the scope of the warrant.

As stated above, on a summary judgment motion, to overcome the qualified immunity defense, a plaintiff must establish (1) a constitutional right was violated and (2) the right was "clearly-established." *Saucier*, 533 U.S. at 201; *see also Butler*, 281 F.3d at 1021.  "The scope of a lawful search is 'defined by the object of the search....'" *United States v. Ewain*, 88 F.3d 689, 692 (9th Cir. 1996) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  A plaintiff can establish a Fourth Amendment constitutional violation if officers conduct a search or seize evidence outside the scope of a search warrant.  *See id*.

Plaintiff asserts that CARVEL and BENDER exceeded the scope of the search warrant by searching for and seizing evidence not

38

included in or defined by the search warrant.  First, Plaintiff
asserts that BENDER's seizure of Plaintiff's guns and a
flashlight exceeded the scope of the warrant.  Second, Plaintiff
asserts that (a) CARVEL's presence at the search and (b) CARVEL's
seizure of the tennis shoes were both outside the scope of the
warrant.  The determination whether Defendants exceeded the scope
of the warrant is a mixed question of law and fact.

### (a)  Whether BENDER exceeded the scope of the warrant.

First, there is no evidence that BENDER conducted a general
search of Plaintiff's belongings or that he searched for items
relating to Plaintiff.  Plaintiff cannot maintain a Fourth
Amendment claim against BENDER based on an unlawful *search*.
There is no dispute that BENDER searched the residence for drugs
in the course of his investigation of Medina's alleged drug
trafficking activities.

There is a dispute, however, as to whether BENDER seized
items outside the scope of the warrant and whether Plaintiff can
maintain a Fourth Amendment claim against BENDER for an unlawful
*seizure*.  Plaintiff claims that the following items were taken
from his apartment but never returned to him:  guns, flashlight,
"red and gray Action tennis shoes."[7]  Plaintiff's counsel stated

_____

[7] Although Plaintiff referred to his shoes as "Action"
tennis shoes in his deposition, Plaintiff's counsel did not
dispute in his papers or during oral argument that the shoes
seized from his apartment were different than the "gray size 10
Nike Cortez tennis shoes" identified by Defendants in their
papers.

during oral argument that Plaintiff testified during his deposition that he saw BENDER carry two garbage bags of things out of his apartment.  However, this portion of Plaintiff's testimony was not attached to Plaintiff's summary judgment submissions.  Plaintiff provided no evidence of a police inventory although Plaintiff's counsel indicated during oral argument that a police report was prepared after the search.

The only evidence regarding the items that were taken, then, is Plaintiff's testimony that they were taken and BENDER's testimony that "the search was not destructive."  (Doc. 39-5, Bender Decl. ¶ 11)  Defendants produced no evidence to contradict Plaintiff's claim that the guns and the flashlight were seized. The question here is whether seizure of the guns and flashlight constitute a Fourth Amendment violation.  Although the scope of a search warrant is "defined by the object of the search," and therefore seizures of objects not defined in a warrant ordinarily constitute unlawful seizures under the Fourth Amendment, there is an exception to this rule.  *Ewain*, 88 F.3d at 692.  Under the plain view doctrine, an officer may seize an item that is not described in the warrant if (1) the initial intrusion is lawful and (2) its incriminating nature is immediately apparent.  *Ewain*, 88 F.3d at 695 (citing *Horton v. California*, 496 U.S. 128, 136 (1990)).

The first element of the plain view test is fulfilled because, as discussed above, BENDER's presence in the apartment was lawful since it was conducted pursuant to a valid warrant. The second element is fulfilled as well.  First, the incriminating nature of guns during a narcotics search is

**40**

1   immediately apparent, if in plain view.  *See Horton*, 496 U.S. at

2   142.  Plaintiff has not provided evidence that the gun was in a

3   place where the officers would not be entitled to search for

4   drugs or in a location outside the scope of the warrant.  There

5   is no evidence regarding where the guns or the flashlight were

6   found.  Plaintiff cannot base a Fourth Amendment claim against

7   BENDER based on the seizure of the guns.

8       Second, the incriminating nature of the flashlight is also

9   immediately apparent in the context of a drug search.  Drugs

10  and/or drug paraphernalia could be hidden in the flashlight or,

11  depending on its size, a flashlight could be used as a weapon.[8]

12  BENDER is entitled to qualified immunity against Plaintiff's

13

14      [8]  Plaintiff cites *Soldal v. Cook County*, 506 U.S. 56, 61
(1992), in support of his contention that the act of seizing

15  unrelated personal property alone is in and of itself a Fourth
Amendment violation.  (Doc. 42, Pl.'s Opp. 11)  *Soldal*, however,

16  does not help Plaintiff's case.  *Soldal* defined a "seizure" as
"meaningful interference with an individual's possessory interest

17  in that property."  The court held that defendant officers who
lifted Plaintiff's mobile home and took it to another location

18  were not entitled to qualified immunity.  The court held that
such a seizure implicated the Fourth Amendment, although it did

19  not hold that such a seizure was *per se* unreasonable because that

20  issue was not before the court.  *Id*. ("Whether the [Fourth]
Amendment was in fact violated is, of course, a different

21  question that requires determining whether the seizure was
reasonable.  That inquiry entails the weighing of various factors

22  and is not before us.")

23
        The Fourth Amendment requires that the seizure be

24  unreasonable to constitute a violation.  U.S. Const. Fourth Am.
("The right of the people to be secure in their persons, houses,

25  papers, and effects, against *unreasonable* searches and seizures,
shall not be violated....") (emphasis added).  Seizure of guns

26  and a flashlight during a narcotics search, even if not
specifically identified in a warrant, is not unreasonable, where

27  Plaintiff fails to offer any evidence about the circumstances

28  under which they were found.

**41**

§ 1983 claim to the extent it is based on his claim that seizure of the guns and flashlight was outside the scope of the warrant.[9]

There is no evidence that BENDER was involved in the seizure of the tennis shoes.  The motion for summary adjudication as to BENDER for alleged unlawful seizure, except as to the guns and flashlight is **GRANTED**.  The Fourth Amendment clause relating to seizure of the tennis shoes relates only to CARVEL.

> **(b)   Whether CARVEL exceeded the scope of the warrant.**

Plaintiff alleges that CARVEL exceeded the scope of the warrant in two ways: (1) CARVEL's presence at the search to assist in an unrelated investigation was unlawful in and of itself; and (2) CARVEL's seizure of the tennis shoes was unlawful.

First, the evidence shows that CARVEL was present at the search for two purposes: (1) "to monitor the search and to discern if any items located on the premises were the fruits of the suspected crimes committed by Kephart," i.e., burglary and fraudulent use of a credit card; and/or (2) to explore the possibility of opening an investigation regarding Plaintiff's

---

[9] To the extent that Plaintiff bases his § 1983 claim on the allegation that the guns and flashlight have not been returned to him in violation of the Fifth Amendment, Defendants' motion for summary adjudication is **DENIED**.  Plaintiff's counsel stated during oral argument that Plaintiff has filed a government claim for the return of his property.  If this is the case, Plaintiff may have a claim against BENDER and the CITY for converting personal property under color of state law.  Whether Plaintiff actually has such a claim depends on various other factors and questions not currently at issue.

involvement in drug trafficking at a nightclub.  Ultimately, the undisputed facts show that CARVEL did not exceed the scope of the warrant by his presence at the search.  As discussed above with respect to BENDER, actively searching for information or evidence relating to CARVEL's investigation of Plaintiff would fall outside the scope of the warrant issued as to Medina.  However, CARVEL testified in his declaration that he "did not actively participate in the search on 3/7/02."  (Doc. 39-7, Carvel Decl. ¶ 21)  Plaintiff has provided no evidence to the contrary.

Plaintiff also attempts to argue that the Medina warrant was used as a pretext for CARVEL to search Plaintiff and Plaintiff's things.  That CARVEL was present at the search in the context of an investigation unrelated or marginally related to the subject of the search warrant is not determinative.  "[S]uch factors as inviting someone along[] may be evidence that the search exceeded the scope of the warrant," although inviting another officer along on a search "is not *ipso facto* improper."  *Ewain*, at 694.  There is no "inadvertent" discovery limitation on the plain view exception.  *Id*. ("If a police officer has a valid warrant for one item, and 'fully expects' to find another, based on a 'suspicion...whether or not it amounts to probable cause,' the suspicion or expectation does not defeat the lawfulness of the seizure.") (quoting *Horton*, 397 U.S. at 138-9).  The officer's subjective intent in inviting another officer along does not alone show the search was beyond the scope:

> [I]t no longer matters that the invited-along officer was looking for what he found, which thing was not described in the warrant.  What matters is whether the officers looked in places or in ways not permitted by the warrant.  That the officer invited along, and not

**43**

the officer to whom the warrant was issued, has
expertise which makes it 'immediately apparent' to him
that objects in plain view are evidence of a crime,
does not establish that the search went beyond the
scope of the warrant.

*Id.* at 695.  Plaintiff provides no evidence that CARVEL looked in
any place or used any search method not authorized by law or
generally recognized police practices.  There is a failure of
proof on this claim.

Second, Plaintiff argues that CARVEL exceeded the scope of
the warrant by seizing the gray size 10 Nike Cortez tennis shoes.
CARVEL testified that he saw the shoes in plain view, and that he
knew that the shoes fit the same description given by the
Footlocker employees.  The plain view doctrine holds that, during
the course of a lawful search for one thing, police officers may
seize a different item that is in plain view if its incriminating
nature is immediately apparent.  *Ewain*, 88 F.3d at 695 (citing
*Horton v. California*, 496 U.S. 128, 136 (1990)).  As stated
above, discovery of the thing not described need not be
inadvertent.  *Id.*

Here, CARVEL's presence at the search was lawful and the
incriminating nature of the tennis shoes was immediately apparent
to him based on his knowledge from the Kephart Footlocker
investigation.  His seizure of the tennis shoes falls within the
plain view exception and there is nothing unreasonable about his
seizure conduct to defeat entitlement to qualified immunity for
Plaintiff's § 1983 claim insofar as it is based on his claim
CARVEL exceeded the scope of the warrant.  At oral argument,
counsel asserted that the Nike tennis shoes were located in a big
pile of shoes in the living room that had to be rummaged through.

44

No evidence of this was submitted.  Even if this assertion were true, there is no prohibition against the officer looking through the pile of shoes for narcotics.

Because Plaintiff has failed to produce evidence to support his claim of a constitutional violation, CARVEL and BENDER are entitled to qualified immunity as to Plaintiff's § 1983 claim insofar as it is based the claim that CARVEL's and BENDER's searches exceeded the scope of the warrant.  Defendants' Motion for Summary Adjudication as to CARVEL and BENDER's qualified immunity as to this issue is **GRANTED**.[10]

---

[10]  Defendants argue that CARVEL is immune from suit because he relied on a valid search warrant and that he did not know at the time that the scope of the search only related to Plaintiff's roommate and not to Plaintiff.  Defendants' argument has no application here.

In support of their argument that CARVEL is entitled to qualified immunity, Defendants cite *Morris v. County of Tehama*, 795 F.2d 791 (9th Cir. 1986) and *Brant v. County of Stanislaus*, 1 F.3d 1246, 1993 WL 285905 (9th Cir. 1993).  First, *Brant* is an unpublished opinion and is cited in violation of Ninth Circuit Court Rule 36-3(a).  *Brant* is not citable authority and will not be considered.  Second, *Morris* is distinguishable.  The Ninth Circuit held in *Morris* that "an officer is entitled to assume the validity of a search warrant secured by fellow officers."  795 F.2d at 795 (emphasis omitted) (citing *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 568 (1971)).  The *Morris* court did *not* hold that an officer is entitled to assume the content and scope of the search warrant.

Indeed, Defendants imply by their very argument that CARVEL *did* exceed the scope of the warrant, particularly considering CARVEL's statement in his deposition that he did not know that the warrant related only to Medina and not to Kephart after the March 7, 2002 search.  Nevertheless, there is still insufficient evidence to create a genuine issue regarding CARVEL's sworn statement in his declaration that he did not actively search for the evidence relating to Kephart.  Pursuant to the plain view doctrine, which has no inadvertent discovery limitation, CARVEL

### 3.   Plaintiff's assertion that the search warrant was overbroad.

Plaintiff asserts in his opposition that BENDER is not entitled to qualified immunity because the search warrant did not adequately and specifically describe the premises to be searched and/or the items to be seized and is therefore overbroad.  (Doc. 42, Pl.'s Opp. 20)  Specifically, Plaintiff asserts that the search warrant did not specify that there were more than two people living at the residence and that one of the bedrooms belonged to the suspect Medina's roommate (i.e., Plaintiff). Defendants, however, did not argue in their motion that BENDER is entitled to qualified immunity as to Plaintiff's claim that the search warrant was overbroad.  Defendants also do not address Plaintiff's arguments in their reply.

It should be noted, however, that the only case Plaintiff cites in support of his argument, *Navarro v. Barthel*, 952 F.2d 331, 333 (9th Cir. 1991), is not applicable.  This case holds that there is a clearly-established constitutional right to be free from searches of the *wrong place*, even if the search is conducted pursuant to a valid search warrant.  This case is distinguishable because it involved the question whether an officer acted reasonably in describing the house to be searched as "the second house on the right" without clarifying which houses were to be considered in determining which house was the second house.  *Id*.  Here, there is no dispute that the apartment

---

is entitled to qualified immunity under the facts as presented here.

described was the right place to be searched.

Ultimately, BENDER is entitled to qualified immunity as to the claim that the search warrant is overbroad.  A search warrant is not overbroad "if the description is such that the officer can with reasonable effort ascertain and identify the place intended" to be searched.  *Mena v. City of Simi Valley*, 226 F.3d 1031, 1036 (9th Cir. 2000) (citing *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)).  Here, the search warrant was issued for narcotics and narcotics paraphernalia with respect to an apartment and a truck that were described in unambiguous detail.  Medina could easily have hidden such items in Plaintiff's room.  This case is not like *Mena*, where a number of people lived in rooms of a house that they kept locked with padlocks.  The apartment was not a "multi-dwelling" unit because Medina could have hidden drugs in his roommate's bedroom.  There is no evidence the door to Kephart's bedroom was kept locked.  BENDER had probable cause to obtain a warrant for the entire premises, and under the authority of the search warrant that specified the entire apartment was authorized to search the entire premises.  Defendants' Motion for Summary Adjudication on this issue is **GRANTED.**

### 4.   Whether the March 7, 2002 Search was Unconstitutionally Destructive.

Defendants do not argue that BENDER and CARVEL are entitled to qualified immunity against Plaintiff's claim the search was destructive.  However, their arguments regarding the merits of the question whether the search was destructive can be construed as an argument for qualified immunity.  If the Defendants can

1    establish there is no genuine issue that the search was

2    reasonably destructive, then there is no constitutional violation

3    and Defendants are entitled to qualified immunity as to this

4    claim as well.

5         Plaintiff asserts that CARVEL and BENDER and other

6    unidentified officers damaged and/or destroyed several items of

7    Plaintiff's personal property, including CDs, a Michael Jordan

8    rookie basketball card, Texaco collector planes, photographs, and

9    a photo album.  (Doc. 43, Pl.'s Response to Def.'s UF No. 7;

10   Doc. 44, Frankenberger Decl. at Ex. A, Kephart Dep. 54:17-21)   In

11   addition, Plaintiff testified during his deposition that, after

12   spending approximately six to eight hours in jail on March 7,

13   2002, he returned to his apartment to find it in "disarray."

14   (Doc. 44, Frankenberger Decl. at Ex. A Kephart Dep. 42:14-25)

15   Defendants do not dispute that the identified items were damaged

16   and/or destroyed.  Instead, Defendants offer only the conclusory

17   assertion that "the search was not destructive."  (*See* Doc. 43,

18   Def.'s UF Nos. 7, 21)

19        Destruction of personal property during a search does not

20   necessarily result in a constitutional violation:

21            [O]fficers executing a search warrant occasionally must
             damage property in order to perform their duty.
22           Therefore, the destruction of property during a search
             does not necessarily violate the Fourth Amendment.
23           Rather, only unnecessarily destructive behavior, beyond
             that necessary to execute a warrant effectively,
24           violates the Fourth Amendment.

25   *Mena*, 226 F.3d at 1041 (internal quotations and citations

26   omitted); *see also Dalia v. United States*, 441 U.S. 238, 258

27   (1979).  Furthermore, "[t]he test of what is necessary to execute

28   a warrant effectively is reasonableness."  *San Jose Charter of*

**48**

the Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962, 971 (9th Cir. 2005); see also United States v. Becker, 292 F.2d 442, 446 (9th Cir. 1991).  "Whether a search is unreasonable because of its intolerable intensity must be determined by the particular facts of each case."  Becker, 292 F.2d at 446.

Plaintiff has met his burden to establish a genuine issue of material fact as to whether the search was unreasonably destructive.  The only evidence Defendants have offered in support of their contention that the search did not violate Plaintiff's constitutional rights consists of two conclusory statements in BENDER and CARVEL's declarations that "the search was not destructive."  Plaintiff has countered these conclusions with testimony that specific items of his personal property were destroyed, including CDs, basketball cards, collector planes, photographs, and a photo album, for which there is no explanation of the need for destruction.  There is no case law holding that the destruction of such items of personal property during a narcotics search alone, without any explanation as to the need for the dstruction, is not unreasonable.  Defendants have failed to meet their burden to show how and why destruction of such items is objectively reasonable in the context of a search for drugs, drug paraphernalia, and cash.  Neither BENDER nor CARVEL is entitled to qualified immunity as to this claim.

Defendants' Motion for Summary Adjudication as to Plaintiff's § 1983 claim insofar as it is based on Plaintiff's claim that the search was unconstitutionally destructive of his personal property is **DENIED**.

**49**

**C.   Whether CARVEL is Entitled to Qualified Immunity as to
Plaintiff's Claims for False Arrest for Burglary and
Fraudulent Use of a Stolen Credit Card.**

Plaintiff bases his § 1983 claim in part on the assertions
that CARVEL arrested him for burglary and fraudulent use of a
stolen credit card (1) without probable cause; and (2) based on
illegally-obtained evidence.

**1.   Probable Cause.**

Freedom from arrest without probable clause is a clearly-
established constitutional right. *Beier v. City of Lewiston*, 354
F.3d 1058, 1065 (9th Cir. 2004) ("That a police officer may
arrest a suspect only if he has probable cause to believe a crime
has been committed is a bedrock Fourth Amendment precept."); *see
also Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002).
Probable cause exists if, "under the totality of circumstances
known to the arresting officers, a prudent person would have
concluded that there was a fair probability that [the defendant]
had committed a crime." *Beier v. City of Lewiston*, 354 F.3d at
1065 (quoting *Grant v. City of Long Beach*, 315 F.3d 1081, 1085
(9th Cir. 2002)); *see also Franklin*, 312 F.3d at 438 ("Probable
cause exists when police have knowledge at the moment of arrest
of facts and circumstances based on reasonably trustworthy
information that would warrant a belief by a reasonably prudent
person that the person arrested has committed a criminal
offense."); *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964).  The
question is "whether the [officers] acted reasonably under
settled law in the circumstances."  *Hunter v. Bryant*, 502 U.S.
224, 228 (1991).

1   Defendants assert that no constitutional violation occurred

2   because probable cause existed for Plaintiff's arrest or, in the

3   alternative, that CARVEL reasonably believed that probable cause

4   existed.  The proper inquiry where officers are claiming

5   qualified immunity for a false arrest claim is "whether a

6   reasonable officer could have believed that probable cause

7   existed to arrest the plaintiff."  *Franklin*, 312 F.3d at 437.

8   The qualified immunity question does not depend on whether

9   probable cause actually existed.

10   The following was known to CARVEL at the time of Plaintiff's

11   arrest:

12      (1)   Mr. Porter reported to CARVEL on January 29, 2002 that

13           Mr. Porter's credit card and wallet had been stolen

14           from the Red Lion Inn on December 31, 2001;

15      (2)   Mr. Porter observed Plaintiff present at the Red Lion

16           Inn on December 31, 2001;

17      (3)   CARVEL confirmed with Red Lion Inn personnel that a

18           room had been registered to "Colleen Kephart" on

19           December 31, 2001;

20      (4)   CARVEL confirmed with Mr. Porter's credit card company

21           that, on January 1, 2002 an attempted charge was made

22           to Mr. Porter's credit card at a Footlocker store;

23      (5)   Footlocker employees Tovar and Martinez identified

24           Plaintiff from a photographic lineup and informed

25           CARVEL that Plaintiff had attempted to purchase a pair

26           of gray size 10 Nike Cortez tennis shoes with a credit

27           card on January 1, 2002; and

28      (6)   Mr./Ms. Tovar and Mr. Martinez also informed CARVEL

that Plaintiff's attempted credit card charge was
declined and Plaintiff then purchased the shoes with
cash.

Finally, CARVEL asserts that he arrested Plaintiff when he saw the gray size 10 Nike Cortez tennis shoes in plain view at Plaintiff's residence during the search on March 7, 2002.

Plaintiff has produced no evidence to dispute these facts. Plaintiff has produced no evidence that there was any reason to doubt his positive identification by the eyewitnesses.  Plaintiff also has not shown that the information from Mr. Porter's credit card company was unreliable or untrustworthy.  Plaintiff has produced no evidence to show that CARVEL did not actually possess the above information at the time of Plaintiff's arrest. Plaintiff only denies that he committed burglary or attempted to use a stolen credit card.  (Doc. 44, Frankenberger Decl. at Ex. A, Kephart Dep. 31:19-20)  However, his denial does not create a genuine issue of material fact as to whether CARVEL had an objectively reasonable belief that probable cause existed to arrest Plaintiff for committing those crimes.  A police officer may arrest a suspect without a warrant if the suspect commits a misdemeanor in the officer's presence or the officer has probable cause to believe the suspect is guilty of a felony not committed in the officer's presence.  Cal. Penal Code § 836(a).

Burglary, as defined by Cal. Penal Code § 459, is committed by: "[e]very person who enters any house, room, apartment...with intent to commit grand or petit larceny or any felony is guilty
//
//

52

1  of burglary."[11]   Burglary is a felony.  Cal. Penal Code §§ 17,

2  461.

3      Theft by fraudulent use of a credit card, as defined by Cal.

4  Penal Code § 484g, is committed by:  "[e]very person who, with

5  the intent to defraud, (a) uses, for the purpose of obtaining

6  money, goods, services, or anything else of value, an access

7  card..., or (b) obtains money, goods, services, or anything else

8  of value by representing without the consent of the cardholder

9  that he or she is the holder of an access card and the card has

10  not in fact been issued...."  Theft by fraudulent use of a credit

11  card is a felony.  Cal. Penal Code §§ 17, 489, 490.

12      Based on the elements of the crimes of burglary and

13  fraudulent use of a credit card, Plaintiff has failed to produce

14  evidence to establish that CARVEL did not reasonably believe he

15  had probable cause to arrest Plaintiff for burglary and

16  fraudulent use of a credit card based on information provided by

17  a reliable citizen informant and evidence in plain view.  The law

18  is clear that where probable cause exists, the officer's

19  subjective state of mind is irrelevant.  CARVEL is entitled to

20  qualified immunity with respect to Plaintiff's § 1983 claim

21  insofar as it is based on claims of false arrest for burglary and

22  fraudulent use of a credit card for lack of probable cause.

23  Defendants' Motion for Summary Adjudication on this issue is

24  **GRANTED**.

25

26      [11] Cal. Penal Code § 460(a) defines burglary of the first

27  degree as: "[e]very burglary of an inhabited dwelling house,
    vessel..., or trailer coach...or the inhabited portion of any

28  other building...."

**2.   Whether Plaintiff can establish a constitutional violation for false arrest based on illegally obtained evidence.**

As discussed above, CARVEL did not seize the tennis shoes unlawfully in violation of Plaintiff's Fourth Amendment rights. Plaintiff has failed to establish a constitutional violation for false arrest based on illegally obtained evidence.  CARVEL was present in the apartment pursuant to a valid search warrant to search for narcotics and related evidence of drug trafficking. The evidence was not obtained illegally.  CARVEL is entitled to qualified immunity with respect to Plaintiff's § 1983 claim insofar as it is based on a claim of false arrest for burglary and fraudulent use of a stolen credit card based on illegally obtained evidence.  Defendants' Motion for Summary Adjudication on this issue is **GRANTED.**

**D.   Plaintiff's Claims for False Arrest for Possession of a Controlled Substance; Disorderly Conduct and Public Drunkenness; Violation of Restraining Order; and Traffic Violations.**

Plaintiff argues that Defendants have failed to meet their burden to show the absence of a genuine issue of material fact as to whether Plaintiff's arrests for possession of a controlled substance, disorderly conduct, violation of a restraining order, and traffic violations lacked probable cause.  Plaintiff's argument is based on a misapplication of the summary judgment burdens.  When the plaintiff carries the burden of proof, as here, it is true that it is the defendant's burden to establish the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 325.  However, the defendant can establish the lack of a

genuine issue by demonstrating an absence of evidence that supports the plaintiff's case. *Id*.   The burden then shifts to the plaintiff to produce evidence that supports the existence of a genuine issue. *Id*.   Here, Plaintiff has provided no evidence regarding the facts surrounding his arrests, let alone evidence that he was arrested without probable cause.

It is undisputed that neither BENDER nor CARVEL was involved in Plaintiff's arrests for possession of a controlled substance, disorderly conduct and public drunkenness, violation of a restraining order, and traffic violations.   Neither BENDER nor CARVEL can be held liable for Plaintiff's § 1983 claim insofar as it is based on Plaintiff's assertions of false arrests by other law enforcement officers for these crimes.

Plaintiff cannot establish a constitutional violation as to his claim for false arrest for possession of a controlled substance based on illegally obtained evidence for an additional reason.   The steroids found in Plaintiff's room were discovered during a search for narcotics.   Plaintiff has not cited evidence that establishes the location and seizure of the steroids was unreasonable.

Defendants' Motion for Summary Adjudication with respect to Plaintiff's § 1983 claim based on false arrest for possession of a controlled substance, disorderly conduct, violation of a restraining order, and traffic violations for lack of probable cause is **GRANTED**.[12]

---

[12] Although Plaintiff cannot base his § 1983 claim on allegations of false arrest for these crimes, this ruling does not preclude the admissibility of evidence relating to the

**E.   Plaintiff's Claim against BENDER and CARVEL for Conspiracy to Violate Civil Rights.**

Plaintiff claims BENDER and CARVEL conspired to violate Plaintiff's civil rights.  Defendants argue they "are able to offer affirmative proof" that the elements of conspiracy have not been fulfilled.  (Doc. 39-3, Def.'s Mem. 17)

To prove a conspiracy between CARVEL and BENDER, Plaintiff must show "an agreement or meeting of the minds to violate constitutional rights." *Franklin*, 312 F.3d at 441 (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-1 (9th Cir. 1989) (internal quotations omitted).  Furthermore, "[t]o be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of conspiracy." *Id.*

Plaintiff alleges generally that BENDER and CARVEL conspired to violate Plaintiff's constitutional rights by investigating him for crimes he did not commit.  (Doc. 42, Pl.'s Opp. 7)  This is a legal conclusion.  Plaintiff has not submitted evidence to support any but one of his alleged constitutional violations, i.e., the destructive search claim.  Since as to the objectives which are not actionable, BENDER and CARVEL are entitled to qualified immunity; no conspiracy claim can survive related to all such alleged constitutional violations, except the destructive search claim. *See id.*

While CARVEL and BENDER both testified in their declarations

circumstances surrounding these arrests to support, for example, Plaintiff's allegations of animus.

1  that they did not enter into an agreement with any other

2  individuals, including one another, to violate Plaintiff's

3  constitutional rights, Plaintiff produced sufficient evidence to

4  the contrary, to create a genuine issue of material fact.

5  Plaintiff cites to the deposition testimony of CARVEL and BENDER,

6  which, if true, would show that BENDER contacted CARVEL before

7  the search to tell him about the search warrant, and that BENDER

8  asked CARVEL to come along (or alternately that CARVEL asked to

9  come along) in order to determine what additional information he

10  could find about Plaintiff, knowing he did not have a search

11  warrant for Plaintiff.  (Doc. 44, Frankenberger Decl. at Ex. A,

12  Carvel Dep. 28:21-25; 29:1-15; Ex. C, Bender Dep. 39:13 to 40:12)

13      While this testimony does not definitively establish a

14  meeting of the minds between CARVEL and BENDER to destroy

15  Plaintiff's personal property, it does create a genuine issue of

16  material fact as to whether CARVEL and BENDER had a meeting of

17  the minds to use the narcotics search warrant as a pretext to

18  violate Plaintiff's constitutional rights.  The standard for a

19  conspiracy claim does not require that "each participant in the

20  conspiracy [] know the exact details of the plan," but instead

21  requires only that the conspirators share the same objective.

22  *Franklin*, 312 F.3d at 441 (quoting *United Steelworkers*, 865 F.2d

23  at 1540-1) (internal quotations omitted).  Conspiracy may be

24  inferred if sufficient facts are alleged.  *See Delew v. Wagner*,

25  143 F.3d 1219, 1223 (9th Cir. 1998) (citing *Adickes v. S.H. Kress*

26  *& Co.*, 398 U.S. 144, 156-7 (1970)).

27      Defendants' Motion for Summary Adjudication with respect to

28  Plaintiff's § 1983 claim for conspiracy is **DENIED**.

**57**

**1**     **F.   Plaintiff's Equal Protection Claim.**

**2**     "To state a claim under 42 U.S.C. § 1983 for a violation of

**3** the Equal Protection Clause of the Fourteenth Amendment a

**4** plaintiff must show that the defendants acted with an intent or

**5** purpose to discriminate against the plaintiff based upon

**6** membership in a protected class." *Lee v. City of Los Angeles*,

**7** 250 F.3d 668, 686 (9th Cir. 2001).  The purpose of the equal

**8** protection clause is to "secure every person within the State's

**9** jurisdiction against intentional and arbitrary discrimination,

**10** whether occasioned by express terms of a statute or by its

**11** improper execution through duly constituted agents." *Village of*

**12** *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)

**13** (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441,

**14** 445 (1923)).

**15**     A successful equal protection claim may be brought by a

**16** "class of one," where the plaintiff alleges that he has been

**17** intentionally treated differently from others similarly situated.

**18** *Id.* at 563.  Plaintiff bases his § 1983 claim in part on the

**19** theory that "DEFENDANTS have singled him out for punishment

**20** because of his work as a bail bondsman...."  (Doc. 42, Pl.'s Opp.

**21** 10)  Plaintiff has provided no evidence that he was treated

**22** differently from other bail bondsmen who were similarly situated

**23** but were not investigated, searched, or arrested, where probable

**24** cause existed.

**25**     Defendants' Motion for Summary Adjudication with respect to

**26** Plaintiff's § 1983 claim for alleged violation of the Fourteenth

**27** Amendment's equal protection clause is **GRANTED**.

**28** //

### G.   <u>Plaintiff's Municipal Liability Claims.</u>

Defendants argue that the CITY is not subject to municipal liability because (1) there is no evidence of an unconstitutional policy or practice pursuant to which Plaintiff was deprived of his civil rights; (2) there is no evidence that MATLOCK ratified the allegedly unconstitutional conduct in question; and (3) there is no evidence that MATLOCK failed to properly train or supervise his subordinates.   (Doc. 39-3, Def.'s Mem. 18-21; Doc. 48, Def.'s Reply 3-4)

Local governments are "persons" subject to suit for "constitutional tort[s]" under 42 U.S.C. § 1983.  *Haugen*, 339 F.3d at 854.  The CITY, as a local government, is therefore subject to suit under § 1983.  However, local governments can only be sued where the claims arise out of unconstitutional actions by their employees who implement or execute a "policy statement, ordinance, or decision officially adopted and promulgated by that body's officers...."  *Monell*, 436 U.S. at 690-1.  In other words, a municipality cannot be held liable for an employee's actions outside the scope of implementation of the policies or customs on a *respondeat superior* theory.  *Id*.  There is no evidence of MATLOCK's personal knowledge of or involvement in the investigations, arrests, and other events surrounding Plaintiff.  To the extent Plaintiff attempts to prove a personal liability claim against MATLOCK, there is no evidence of MATLOCK's participation or knowledge.

A municipality can, however, be held liable for the acts of one of its employees acting in an "official" capacity. "'[O]fficial-capacity suits...generally represent only another

1  way of pleading an action against an entity of which an officer
2  is an agent.'"  *Ruvalcaba*, 167 F.3d at 524 n. 3 (quoting *Graham*,
3  473 U.S. at 165).

4      Plaintiff has failed to meet his burden to provide any
5  evidence to support his assertions of municipal liability.  The
6  only evidence Plaintiff cites in support of any of the municipal
7  claims is the deposition testimony of John Thomas Pryor, whose
8  identity is not made clear, and the deposition testimony of Chief
9  MATLOCK.  Furthermore, Mr. Pryor's testimony does not discuss
10 MATLOCK, other than stating that he was the chief of police on
11 March 7, 2002 and that his assistant chief was an individual
12 named Bill Rector.  Chief MATLOCK's testimony does not establish
13 that he knew anything about BENDER and CARVEL's investigations or
14 searches, let alone that he ratified them or had any
15 participation in them.

16     By citing this testimony, Plaintiff attempts to establish
17 that MATLOCK deferred to his captains to review case work by
18 detectives and is using Pryor's testimony to establish a chain of
19 command.  (*See* Pl.'s DF No. 70)  Plaintiff makes no attempt to
20 identify the individuals in the chain of command who made any
21 decisions or approvals of the actions in dispute, nor does he
22 attempt to explain how the structure of the chain had any
23 causative effect on this case.  None of the testimony cited by
24 Plaintiff addresses MATLOCK's supervisory or training activities.
25 There is also no evidence of a custom or practice for which the
26 CITY can be held liable.

27     Defendants' Motion for Summary Adjudication as to
28 Plaintiff's § 1983 claim against the CITY and MATLOCK is **GRANTED.**

**60**

**H.   Plaintiff's Assertion that his Civil Rights Were Violated by BENDER's Alleged Interference With Plaintiff's Apprehension of an "International Fugitive."**

Plaintiff offers no legal or factual basis upon which he can sustain a § 1983 action based on the allegation that a police officer "interfered" with Plaintiff's capture of an alleged international fugitive, Scott Gallegos.  Not only does Plaintiff fail to explain or describe the facts surrounding this incident (other than that he lost approximately $30,000.00 in bond money posted for the "fugitive"), Plaintiff's arguments consist of nothing more than conclusory statements, without any citation to facts or controlling law.  (*See* Doc. 42, Pl.'s Mem. 16)  BENDER's purported refusal to arrest Gallegos cannot give rise to BENDER's civil liability to Plaintiff.  Defendants' Motion for Summary Adjudication as to this issue is **GRANTED**.  This holding does not preclude the possible admissibility of evidence relating to the Gallegos incident as evidence of animus.


**I.   Plaintiff's Assertions of First Amendment Retaliation.**

To the extent Plaintiff attempts, in his opposition, to assert a § 1983 claim based on a claim of retaliation for exercising his First Amendment right to free speech and his "constitutionally protected rights to employment," Plaintiff's claim fails.  Plaintiff's basis for the retaliation claim is difficult to discern from the language of his opposition, but he appears to base this claim on Defendants' alleged disdain for Plaintiff's T-shirts with the slogan "CRIME PAYS" printed on the front.  Although the described incident may evidence disagreement

**61**

1   with Plaintiff's T-shirt mottos there is doubtful causitive
2   relation with First Amendment retaliation.   However, it is not
3   necessary or appropriate to decide that issue as it was not
4   properly raised.   Defendants are correct that Plaintiff's claim
5   of retaliation is not pled in the operative complaint.   This may
6   be anecdotal evidence of animus but is not a standalone claim.
7   Plaintiff's alleged First Amendment retaliation claim is not
8   before the Court.

9

10   **VII.   <u>CONCLUSION</u>**

11

12   For all the foregoing reasons, BENDER and CARVEL's
13   Motion for Summary Adjudication is **GRANTED** on qualified
14   immunity grounds as to Plaintiff's § 1983 claim to the
15   extent it is based on Plaintiff's allegations of
16   judicial deception; exceeding the scope of the warrant;
17   overbreadth of the warrant; false arrest; and selective
18   enforcement (Fourteenth Amendment); and

19

20   BENDER and CARVEL's Motion for Summary Adjudication is
21   **DENIED** as to Plaintiff's claims for destructive search
22   and conspiracy to violate civil rights.

23

24   The CITY and MATLOCK's Motion for Summary Judgment is
25   **GRANTED**.

26

27   Defendants shall submit an order consistent with this
28   decision within five (5) days following service by the

clerk of this decision.

SO ORDERED.
DATED: July 16, 2005.

                                    ___/s/ OLIVER W. WANGER___
                                       Oliver W. Wanger
                              UNITED STATES DISTRICT JUDGE